Death Opinion














IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-76,810






RODERICK HARRIS, Appellant


 

v.



THE STATE OF TEXAS





ON DIRECT APPEAL FROM CAUSE NO. F09-00409


IN THE CRIMINAL DISTRICT COURT NUMBER 7

DALLAS COUNTY






 Cochran, J., delivered the opinion of the unanimous Court.


O P I N I O N




 In May 2012, a jury convicted Roderick Harris of capital murder for the shooting
death of Alfredo Gallardo during a home-invasion robbery. (1) Based on the jury's answers to
the special issues set out in Texas Code of Criminal Procedure Article 37.071, the trial judge
sentenced Harris to death. (2) After reviewing Harris's 132-page brief on direct appeal, which
sets out forty points of error, we conclude that his claims are without merit. (3) Accordingly,
we affirm the trial court's judgment.

Factual Background


 On the evening of March 17, 2009, appellant robbed the Gallardo family in their east
Dallas mobile home. He held three adults, one teen-age girl, and two boys at gunpoint. 
During the robbery, he shot and killed the father, Alfredo, and his brother, Carlos. 

 The evidence showed that, at about 9:00 p.m. on St. Patrick's Day, Alfredo was at
home with his wife, Maria, his brother, Carlos, a son, a grandson, and his thirteen-year-old
daughter, Yahaira. Alfredo was about to go out to look for Yahaira's older sister when a
"black guy" burst through the door and pointed his gun at Alfredo's head. Yahaira was
"shocked" and "scared," the more so when the man-appellant-told her, "Come here, bitch." 
Yahaira's mother started to cry as appellant pointed his gun at them and, in a loud voice,
asked for money, jewelry, and drugs. Yahaira translated appellant's demands for her parents
because they did not speak much English. She took her mother's purse from the counter and
gave appellant all of the money inside-two dollars. 

 Yahaira's father was sitting on the sofa, but when he started to stand up, appellant hit
him so hard in the face with the back of his gun that his cheek started bleeding. Then, when
Carlos tried to get his wallet out of his pocket, appellant hit him near the eyebrow with the
gun. Carlos also started bleeding. Appellant told Alfredo and Carlos to get down on the
floor, and then, still pointing his gun at them, appellant took their wallets from their pants
pockets.

 Then he took everyone to the master bedroom, and Yahaira handed him the little bit
of jewelry-a necklace and two rings-that they had. Appellant pushed them all through the
bathroom and toward a closet, still pointing his gun at them. He told Yahaira to tie her
uncle's hands with some belts while he tied her father's hands. He was shouting at them as
he kept trying to close and lock the closet door, and Yahaira's mother was crying. Yahaira
thought, "We were going to die." Appellant then asked for the keys to their red truck, but
Yahaira told him that her brother Omar had them and that he was at a party. (4)

 Appellant "told us like, what kind of family like us didn't have money? And that if
we didn't have money, we should do like-we should do what he did; that he didn't hurt
people, he just robbed houses." Then he pointed to Yahaira's mother and said that she was
to go with him because "he wanted to take her." She was crying and praying in Spanish, so
appellant pointed at Yahaira and said that he was going to take her instead. When Yahaira's
mother kept crying, appellant finally pointed his gun at Alfredo while telling Yahaira's
mother to calm down or he would "hurt" them. Yahaira thought he would shoot them. 

 Then appellant grabbed Alfredo's shirt and started walking him toward the restroom,
but they fell on top of the Jacuzzi "and that's when the shooting came out[.]" Appellant shot
Alfredo in the face and chest. Then Carlos, Yahaira's uncle, got up as if he were trying to
help, and appellant shot him in the face and shoulder. Yahaira and her mother were crying
on the floor of the closet when Yahaira felt the wind from another bullet pass by her. She
thought appellant had fired a total of about six bullets.

 Yahaira looked back out to the bathroom and saw appellant push "my dad off of him
like he was disgust[ed], because of the blood." He finally ran out the door. Yahaira heard
"snoring" sounds from either her father or her uncle lying on the floor and saw her father
shaking. Finally, a policeman ran in and took them out of the house. (5)

 Appellant had killed both Alfredo and Carlos.

 During the punishment phase, the State offered evidence of several other aggravated
robberies, including another capital murder, that appellant had committed during the month
before the charged capital murder. On February 15, 2009, appellant and his cohort 
confronted Luis Gonzalez at his apartment door, forced him inside, tied him up, and robbed
him of his wallet with $450 in it, his watch and shoes, a set of wheel rims, a stereo, and his
friend's wallet, which was hidden in the sofa, with $900 in it. Then they dragged Mr.
Gonzalez into the bedroom while they ransacked his apartment. Mr. Gonzalez managed to
untie himself while appellant and his fellow robber were carrying items out to their car, and
he ran and locked them out of his apartment. Appellant started beating on the door, saying,
"[O]pen the door, you son-of-a-you-know-what." Mr. Gonzalez did not open the door, but
he couldn't call the police because appellant had stolen his cell phone. The robbers finally
left in appellant's car. Appellant's DNA was on a glove left at Mr. Gonzalez's apartment.

 At about 10:30 p.m. on March 3, 2009, Karen De La Cruz Espinoza was walking
through the parking lot of her apartment complex with her eleven-year-old son when she saw
three black men coming hurriedly toward her. As she got to her front door, one of
them-appellant-pushed open the door and shoved her and her son inside. Her husband and
three of her four other children were already inside. The robbers immediately closed all of
the shades, pointed their guns at the heads of two of her children, and told Karen that they
wanted her handbag with money and that "if we didn't give them what they wanted, that they
were going to kill us all." One of the robbers went to the back room, grabbed Karen's
husband, pulled him into the living room, and threw him on the floor. 

 The robbers then ransacked the bedrooms, pulling out all of the drawers and emptying
the contents on the floor and beds. They took Karen's wallet with her paycheck in it, as well
as her husband's wallet, her watch, an Xbox, DVDs, and other items. As two of the robbers
started taking items down the stairs, Karen heard several shots and thought that the robbers
had "found someone else" to hurt. The third robber immediately picked up the rest of the
bags of property that they had collected, but Karen rushed forward, pushed him out the door,
and locked it. They all stood back from the door because they were worried the robber would
start shooting through it. 

 Appellant then went to another apartment at the complex, that of Roberto Ramos. 
Roberto's 27-year-old brother, Eustacio, heard a commotion in the hallway while he was in
the bathroom talking on the phone to his grandmother in Mexico. When he looked out, he
saw Roberto struggling with appellant, who had gotten inside the apartment. Roberto was
trying to push him back outside, but appellant was too big and strong. When Eustacio went
to help Roberto, appellant shot Eustacio in the chest from about four feet away. Roberto 
cried, "Oh, he shot you, he killed you, he hit you in the heart." Eustacio was "stunned" and
fell backwards as he saw his brother struggling with appellant. Eustacio said, "I heard a shot
and then a moment later, seconds later, I heard another shot. And I was saying, oh, God, and
I was screaming to my brother. After that, I didn't know anything else." 

 A third brother, Martin, came into the living room and saw Roberto struggling with
appellant, but when Martin came toward the door, appellant reached over Roberto's shoulder
and shot him in the face. Then, as another neighbor watched from his door, Roberto 
"bearhugged" appellant who then shot Roberto three times-in the upper back, in the mouth,
and in the left thigh. Roberto died in the apartment breezeway, but his two brothers, Eustacio
and Martin, survived. Roberto's thirteen-year-old daughter, Jasmine, called 911 and then
found her dead father outside: "I told him I loved him and I kissed him on his cheek." The
robbers escaped.

 The State also offered evidence of appellant's youthful conduct: He was assigned to
a behavioral adjustment classroom for disruptive students when he was in middle school. 
A school resource officer testified that appellant had a poor reputation for being peaceful and
law-abiding at age fourteen and recalled an incident in which appellant became "combative"
when his mother reported him as a run-away. In high school, he carried a knife with a six-inch blade to school. When it was discovered, he was arrested. He was arrested the next
year for possession of marijuana. 

 Appellant had numerous gang tattoos on his body, including "HUSTLA" on his right
forearm. The State's gang expert explained that this tattoo indicated that appellant is
"hustling for his money. He is hustling in life. He is hustling to get ahead," usually by
selling narcotics. He also had a "Fish Trap" tattoo, stars, and the numbers 212 and 3500,
which indicate that appellant is a Fish Trap Bloods gang member. The expert said that the
Fish Trap Bloods are a particularly violent gang known for "murders, aggravated robberies,
narcotics selling, assaults, home invasion robberies. You name it, they have done it." 

 The State also called several police officers who testified that they had arrested
appellant in Dallas for various offenses: on December 5, 2002, for unauthorized use of a
motor vehicle; on December 23, 2003, on warrants for probation violation and burglary; on
September 20, 2006, for traffic violations in which he was later charged with being a felon
in possession of a firearm; on April 17, 2007, for unauthorized use of a motor vehicle; and
on December 27, 2007, for possession of marijuana.

 In his punishment case, appellant called four family members to testify to his family
history, youth, education, and good character. They said that appellant was diagnosed with
attention deficit disorder at age six or seven and that he was placed in special education
classes because of his behavioral problems. When he was young, appellant set a room of his
family's house on fire. Family members testified that appellant's mother, who suffers from
manic depression and schizophrenia, gave him insufficient attention and affection when he
was young. By the time he was eleven or twelve, he was helping to care for his two younger
brothers and protecting them from his parents' violence and fighting. 

 Appellant started using drugs-alcohol, marijuana, and PCP-when he was young. He
would become paranoid and hear voices when he used drugs. Appellant has three children. 
While in jail awaiting trial, appellant told the mother of one of his children-who had accused
him of not "caring" or he would not have put himself in his present situation-that he had
"motherfucking bills to pay." In another phone call, appellant told a friend that when he got
to prison he would "put bread in his pocket" and continue "the hustle." He was already
running the jail tank by bullying other inmates and using their commissary funds. 

Sufficiency of the Evidence


A. Sufficiency to prove capital murder

 In his fifteenth point of error, appellant claims that the evidence was legally
insufficient to prove that he committed capital murder-an intentional killing in the course of
committing robbery-as opposed to plain murder and an unrelated theft. Appellant first
argues that there was no nexus between the two: "There is nothing in the record to indicate
that Appellant went to the [Gallardo's] house to murder the Complainant in order to rob
him." (6) Second, appellant argues that he did not act with the specific intent to kill Alfredo;
rather, appellant's gun "went off" when Alfredo fell against him (or pushed him), and the
two fell into the Jacuzzi.

 When reviewing the sufficiency of evidence, we consider all of the evidence in the
light most favorable to the jury's verdict and decide whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. (7) This standard
"recognizes the trier of fact's role as the sole judge of the weight and credibility of the
evidence after drawing reasonable inferences from the evidence." (8) Therefore, on appellate
review, we determine whether the necessary inferences made by the trier of fact are
reasonable based on the "cumulative force of all of the evidence." (9) We conduct this review
by measuring the evidentiary sufficiency with "explicit reference to the substantive elements
of the criminal offense as defined by state law." (10) 

 Under Texas law, a person commits capital murder if he (1) intentionally commits
murder (2) in the course of committing or attempting to commit robbery. (11) A person acts
intentionally, or with intent, with respect to a result of his conduct when it is his conscious
objective or desire to cause the result. (12) Intent to murder can be proven through
circumstantial evidence of the defendant's acts and words surrounding the crime. (13) In a
capital-murder case based on a robbery, there is no requirement that the intent to cause death
be premeditated before the robbery. (14) Instead, the intent may be formed when the murder is
actually committed. (15) "The jury may infer the intent to kill from the use of a deadly weapon
unless it would not be reasonable to infer that death or serious bodily injury could result from
the use of the weapon." (16)

 The jury could infer appellant's intent to kill Alfredo Gallardo at the moment that he
pulled the trigger of his gun, from the evidence of appellant's acts, words, and conduct
during the home invasion, including the following:


 Appellant burst into the Gallardo's home at night brandishing a Glock pistol
which he then pointed at Alfredo's head;

 He began demanding money and jewelry while threatening with his gun;

 He hit both Alfredo and Carlos in the face with that gun;

 He took their wallets while pointing his gun at them;

 He pointed his gun at Yahaira and called her a "bitch";

 He moved the family through the house while pointing his gun at them;

 He was angry and threatening throughout the robbery and said that he would
"hurt" them if Yahaira's mother did not calm down and keep quiet;

 He pulled Alfredo out of the closet by his shirt and started pushing him
through the bathroom before the two men fell into the Jacuzzi;

 He immediately shot Alfredo twice: once in the head and again in the chest; (17)
and

 He then immediately turned his gun on Carlos and shot him twice: once in the
face and again in the shoulder.



Considering the totality of the circumstantial evidence of appellant's words, acts, and
conduct, we conclude that there is sufficient evidence to prove, beyond a reasonable doubt,
that appellant intended to kill Alfredo Gallardo when he shot him in the head and chest.

 Appellant also claims that the theft of items from the Gallardo family was just an
"afterthought" to the murder. As he notes, proof of robbery "committed as an afterthought
and unrelated to a murder" is not sufficient evidence of capital murder. (18) However, in this
case, the evidence is clearly sufficient to prove, beyond a reasonable doubt, that appellant had
the intent to commit robbery at the moment that he pushed in the Gallardo's door and began
his home invasion robbery-murder. There is ample evidence of a nexus between the murder
and the robbery. Indeed, there is no other rational explanation for appellant's presence in the
Gallardo home at the time that he murdered Alfredo and Carlos. As appellant told them
himself, if they didn't have enough money, they should do as he did - rob houses. The
evidence is sufficient to prove that appellant intentionally killed Alfredo Gallardo during the 
robbery of the Gallardo family. (19) We overrule appellant's fifteenth point of error.

B. Sufficiency to prove "future dangerousness"

 In his twenty-third point of error, appellant claims that the evidence is insufficient to
prove the "future dangerousness" special issue (20) because (1) there was no evidence that
appellant had prior convictions for violent felonies, and (2) his witnesses testified that he
essentially was a low risk for future dangerousness. The State has the burden of proving the
future-dangerousness punishment issue beyond a reasonable doubt. (21) In deciding that issue,
the jury may consider all of the evidence admitted at both the guilt and punishment stages. 
 Appellant relies on Roney v. State, (22) in which we stated, 

 Although this was a senseless murder, that fact is true of every murder in the
course of a robbery. The facts of this offense, standing alone, do not carry the
marks of a "calculated and cold-blooded crime" . . . . To support a "yes"
answer to the second punishment issue, the evidence must show beyond a
reasonable doubt that there is a probability appellant would commit criminal
acts of violence that would constitute a continuing threat to society. To hold
that the facts of this offense, standing alone, would support such a verdict,
would mean that virtually every murder in the course of a robbery would
warrant the death penalty. (23)

But this jury had ample evidence, besides the double murder during the home-invasion
robbery, to support its finding that appellant would likely commit criminal acts of violence. 
That evidence included the following:


 On February 15th, approximately one month before this capital murder,
appellant committed another aggravated robbery at the home of Luis Gonzalez
in which appellant also pointed his gun at the head of his robbery victim,
demanded money, and ransacked his victim's apartment.



 

 On March 3rd, approximately two weeks before this capital murder, appellant
committed another home-invasion aggravated robbery at the apartment of
Margarito Torres and Karen De La Cruz Espinoza; appellant pointed his gun
at the heads of children as he threatened to kill the family; again he ransacked
their apartment and stole cash, a payroll check, a watch, and other household
items.

 Immediately after that robbery, appellant tried to enter Roberto Ramos's
apartment in the same apartment complex. While appellant and Roberto
struggled at the door, Roberto's brother, Eustacio, came to help, but appellant
shot him in the chest. Appellant shot a third brother, Martin, in the face, and
then shot Roberto three times-in the mouth, upper back, and left thigh-and
killed him.



Additionally, appellant had a lengthy criminal record, albeit none of his prior convictions
were for violent offenses; they were for such offenses as drug possession, unauthorized use
of a motor vehicle, felon in possession of a weapon, and burglary. But appellant's more
recent dangerous and deadly crimes showed an escalating pattern of violence. (24) He had a
long history of disruption, drugs, guns, and gang activities, which began in middle school and
continued up to the time of trial, including bullying other prisoners while being held in jail
before the trial began.

 Viewed in the light most favorable to the jury's verdict, the evidence is sufficient to
prove, beyond a reasonable doubt, that appellant would constitute a continuing threat to
society. (25) We overrule appellant's twenty-third point of error.

Jury Selection Claims


A. Batson claims 

 In his first four points of error, appellant claims that the trial judge erred in overruling
his Batson (26) challenge to four of the prosecutor's peremptory challenges used on African-Americans. In Batson, the United States Supreme Court held that, while a prosecutor
ordinarily may exercise peremptory strikes for any reason or no reason, "the Equal Protection
Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" (27)
 A Batson challenge to a peremptory strike consists of three steps: (1) the opponent of
the strike must establish a prima facie showing of racial discrimination; (2) the proponent of
the strike must then articulate a race-neutral explanation; and (3) finally, the trial judge must
decide whether the opponent has proved purposeful racial discrimination. (28) Once the
prosecutor offers race-neutral explanations for his peremptory strikes, the burden is on the
defendant to convince the trial judge that the prosecutor's reasons were not race-neutral, but 
were, in fact, pretextual. (29) Thus, the burden of production shifts from the defendant in step
one to the State in step two, but the burden of persuasion never shifts from the defendant. (30) 
The trial judge's ruling in the third step-whether there is proof of purposeful discrimination-
must be sustained on appeal unless it is clearly erroneous. (31)

 In this case, the prosecutor argued at trial that appellant did not make a prima facie
showing that he had exercised his peremptory challenges on the basis of race, but without
conceding that a prima facie showing had been made, he wanted to put his explanations for
each of the four challenged strikes on the record. 

 He explained that he struck Donna Brewer because she had consistently stated, in both
her questionnaire and testimony, that the death penalty is not applied fairly in Texas or
Dallas. She wrote, "The death penalty is used less with majority." She then explained that
she thought that "blacks and Hispanics are subject to the death penalty more than the
majority" even today. She believed that there's a racial bias regarding the death penalty. The
prosecutor said that the only other juror who thought that the death penalty was not fairly
applied was Troy Gamble, also an African-American, and the prosecutor struck him as well. 
He explained that "our opinion is that if that's her belief system, then she's going to have a
lot tougher time than people who don't have that belief that falls along racial lines." The trial
judge denied the Batson challenge to Ms. Brewer.

 The prosecutor explained that he struck Doris Bennett (and Troy Gamble) for the
same reason that he struck two white jurors; she, like they, circled the statement that
"Although I do not believe that the death penalty should ever be imposed, as long as the law
provides for it, I could assess it under the proper set of circumstances" on her questionnaire. 
The prosecutor said that he categorically struck all prospective jurors who circled this
answer; nothing else could rehabilitate them after that answer. (32) The judge denied the Batson
challenge to Ms. Bennett.

 The prosecutor next explained that he struck Troy Gamble because he had originally
agreed with the same statement as Ms. Bennett about the death penalty, but then crossed out
that answer. Furthermore, he vacillated during his testimony and "basically told the State
that he couldn't participate in this. He couldn't take the oath because of his feelings
regarding the death penalty." And he was a track coach, a teacher, an assistant pastor, and
he said that "I'm okay with regular jury service, just not a case involving the death penalty." 
Then, when questioned by the defense, "[h]e became a vacillating juror." Additionally, "he
required a higher burden of proof, a hundred percent proof." 

 Finally, Mr. Gamble circled the statement that he would accept voluntary intoxication
as a defense to the commission of a crime, and then scratched it out, but he did agree that "a
person's use of drugs or alcohol at the time of the offense [would] automatically prevent you
from assessing the death penalty if you found him guilty of capital murder." Only he and one
other prospective juror-whom the prosecutor also struck-circled this statement. The
prosecutor noted that he had originally challenged Mr. Gamble for cause, but that the judge
overruled that challenge. The defense noted that the trial judge had overruled the challenge
for cause when Mr. Gamble stated that he was "disciplined enough to answer the questions
honestly and make the right decision. If I'm put there, I'll do what I'm supposed to do[.]"
The judge overruled the Batson challenge to Mr. Gamble.

 The lead prosecutor said that he had struck Diane Moore, because his co-counsel had
some "unique information" about her which he would explain. This second prosecutor
explained that Ms. Moore was the cousin of the official court reporter in another district
court, so this prosecutor asked the court reporter if there was 

 anything we needed to know about this particular prospective juror who was
her cousin, and basically informed her that, you know, this was the type of case
where, based on the facts we had, we expected we were going to get a death
sentence and trying to find out if she could do it.

 The court reporter informed me that she could, but what she told me
was that it would-it would make for interesting family gatherings, was her
words. And the face she made-I know her. I've been in that court for about
a year now. The face she made, her expression and her demeanor and the way
she said it, clearly, unequivocally, unambiguously told me that what she was
saying is that it would create friction in the family when they got together if
she went to the family saying that she had voted for a death sentence in a
particular case.

 . . .

 At this point, believing that we had information about her that could
cause her pause in deliberating on this case and actually assessing the death
penalty, we chose to exercise a strike on this.

 And we felt like this-we felt like this family pressure could possibly be
a situation which could influence her verdict. It could be something that could
affect her ability to make that decision.


The prosecutor explained that he did not ask Ms. Moore anything about her cousin or family
gatherings because he did not talk to the court reporter until after Ms. Moore had already
been interviewed by the prosecutors and defense. And the prosecutor said that he had no
reason not to trust the accuracy of the court reporter, whom he knew well. The judge denied
the Batson challenge to Ms. Moore. (33)

1. Appellant did not make a prima facie showing of racial discrimination.

 First, we agree that the defense did not make a prima facie showing of racial
discrimination in the prosecutor's use of peremptory strikes. Because the trial judge
overruled the prosecutor's objection to that failure, the State has preserved the issue for
appeal. (34) The panel of qualified prospective jurors consisted of 38 whites, eight African-Americans, and two Asians. The State exercised only eleven peremptory strikes in selecting
the jury and then two more for the alternates. Four of its total of thirteen strikes, or less than
a third, were used on African Americans. Appellant exercised a total of nineteen peremptory
strikes with eighteen of them on whites and one on an Asian. 

 The final jury was composed of eight whites, three African-Americans, and one Asian,
with one white and one African-American alternate jurors. While 16.7% of the qualified
prospective jurors were African-American, 25% of the final jury was African-American, as
were 50% of the alternates. 

 Appellant argues that he may rely solely on the fact that the State struck half or 50%
of the African-American prospective jurors. (35) But, by itself, the number of African-Americans struck by the State or the number of whites struck by the defense is an irrelevant
statistic. (36) What matters is the relation between the entire qualified panel and the number of
jurors of a particular race who were struck. The panel of qualified jurors in this case was 48
persons. Of these 38 (79%) were white, eight (or 17%) were African-American, and two (or
4%) were Asian. If the twelve jurors and two alternates were chosen at random out of the
48, one would expect that either two or three black jurors would be selected (17% of
fourteen; the same ratio as African-Americans to the entire jury panel). In this case, four
African-Americans were among the twelve jurors and two alternates, which is more than
would be expected by random selection. (37) The State did not use a disproportionate number
of peremptory strikes to exclude African-Americans. We find that appellant has not made
a prima facie showing of racial discrimination under Batson.

2. The prosecutors gave race-neutral explanations for their strikes. 

 However, even if we concluded that appellant had made such a showing, we agree
with the trial judges (38) that the prosecutors gave racially neutral explanations for their strikes
and that appellant failed in his ultimate burden in proving purposeful racial discrimination.

 The State's burden at the second stage of a Batson claim is to merely present a facially
valid, race-neutral explanation for its strikes. (39) As noted above, the prosecutor gave race-neutral explanations for each of his strikes of African-American venirepersons. Although
appellant questioned the validity of some of those explanations (for example, he argued that
Ms. Brewer was correct in thinking that the death penalty was unfairly applied in Texas), he
failed to show that the prosecutors' explanations were not race-neutral or were pretextual. 
 A prosecutor's explanation that he exercised a strike based on a venireperson's
opinion about the death penalty is facially race-neutral. (40) Similarly, a prosecutor's
explanation that a juror would hold the State to a burden of proof higher than beyond a
reasonable doubt is race-neutral. (41) And a prosecutor's explanation that a potential juror's
participation in the case might cause friction within her own family (42) is a facially race-neutral
explanation, even if it is a "silly or superstitious" one. The issue at stage two of a Batson
challenge is not the reasonableness of the explanation, but its genuineness. (43) A race-neutral
explanation need not be persuasive or even plausible to satisfy stage two of Batson.

3. Appellant did not carry his burden to prove purposeful discrimination.

 It is the trial judge's role, at stage three, to assess the plausibility or persuasiveness of
the explanation. (44) Thus, "[i]n the typical peremptory challenge inquiry, the decisive question
will be whether counsel's race-neutral explanation for a peremptory challenge should be
believed." (45) Because the evidence on the credibility of the prosecutor's explanation is often
vague or ambiguous, "the best evidence often will be the demeanor of the attorney who
exercises the challenge." (46) Thus, "evaluation of the prosecutor's state of mind based on [his]
demeanor and credibility lies 'peculiarly within a trial judge's province.'" (47) The Supreme
Court has instructed us to accord "great deference" to the trial judge's findings in this
context, (48) and appellant has failed to persuade us that the four judges supervising the Batson
challenges in this case erred in their credibility assessment. (49) The trial judges found that
appellant had failed to prove that the prosecutors purposefully discriminated against any of
the four jurors on the basis of race. We conclude that their conclusion is not clearly
erroneous. (50) We therefore overrule appellant's points of error one through four.

B. Denial of appellant's challenges for cause

 In points of error five through ten, appellant claims that the trial judge violated his
constitutional and statutory rights by denying him challenges for cause against six potential
jurors-Lynda Waters, Allen Gooch, Virginia Day, Matthew Smith, David Calvery, and an
alternate, Kimberly Thomas. (51) Appellant argues that these purported errors required him to
use peremptory strikes against each of the jurors and forced him to accept an objectionable
juror whom he would have struck had he not used up all of his peremptory strikes and the
two additional strikes that the trial judge granted him. However, David Calvery, the juror
who appellant claimed was objectionable and whom he would have struck if he had an
additional strike, was removed from the jury before the deliberations began, and an alternate
took his place. Therefore, appellant has not shown that he was harmed by the trial judge's
denial of these five challenges as no objectionable juror participated in the deliberations. (52) 
 Furthermore, appellant was granted two additional peremptory challenges, so he
would have to show that the trial judge erred in denying at least three of his challenges for
cause before he could establish harm, even if the "objectionable juror," Mr. Calvery, had
actually served on the jury during deliberations. (53)

 Finally, appellant has not established that the trial judge erred in denying any of the 
challenges for cause. We review the trial judge's ruling with "considerable deference"
because he is "Johnny-on-the-Spot" and in the best position to evaluate the venireman's
demeanor, attitude, and tone of voice. (54) We grant the trial judge particular deference when
the prospective juror's answers are "vacillating, unclear or contradictory." (55)

 Appellant argues that his challenge to Lynda Waters should have been granted
because (1) she failed to "under[stand] the issues"; (2) she did not have sufficient "gravity"
and respect for a death penalty case; and (3) she was disrespectful toward counsel. The State
counters that, once the law was explained to her, Ms. Waters understood that the State was
required to prove intent to kill and that she would hold the State to that burden. Concerning
her lack of "gravity," the trial judge noted that he did hear her giggling at one point, "but I-I
didn't think it was inappropriate. . . . I think she was trying to be responsive." She had a little
difficulty understanding some of the concepts, but "she kept reiterating the fact that she could
be fair, that she could listen to the evidence, . . . and that she would make her decisions based
on the evidence and the law." He did not believe that she was disrespectful of either the
process or defense counsel. The trial judge was in the best position to evaluate Ms. Walter's
responses, her understanding of the law, as well as her attitude and demeanor. (56) We overrule
appellant's fifth point of error.

 Appellant challenged Allen Gooch, claiming that he did not understand the first
special issue and because he was argumentative, disrespectful, and openly hostile to defense
counsel. The record reflects that the prosecutor discussed the first special issue with Mr.
Gooch extensively and that he repeatedly said that he understood the purpose of the issue 
and could follow the law concerning that special issue. He would not automatically answer
that issue, and he was "not leaning toward anything." The trial judge also noted that Mr.
Gooch "was frustrated [with defense counsel] at times, but . . . [h]e understood to keep an
open mind, hear all the evidence, then make his decision based upon all the evidence
presented to him[.]" Again, the trial judge was in the best position to evaluate Mr. Gooch's
responses and his understanding of the law, as well as his attitude and demeanor. (57) We
overrule appellant's sixth point of error.

 Appellant challenged Virginia Day, arguing that she would automatically answer
special issue number two - the mitigation special issue - "no." On appeal, appellant also
claims that the trial judge improperly rehabilitated her. When questioned by the prosecutor,
Ms. Day repeatedly indicated that she understood that she must keep an open mind, listen
to the evidence, and consider all of the evidence in answering special issue number two. She
said the same in answer to queries by defense counsel. After a lengthy, convoluted
hypothetical question posed by defense counsel, he ended with

 -then when you get to Special Issue Number 2, while you might can look at
some of these things, that your concern for the people in his society is going
to be such that you could not answer that issue in a way that he would get the
life penalty and be put in his society where he's going to be a danger.

 Is that what I'm hearing you say?


 Ms. Day: That's what you're hearing me say.


Immediately after that answer, appellant passed Ms. Day and challenged her for cause. 
Given the ambiguous question and answer, the trial judge questioned Ms. Day himself to
make sure that she understood the law concerning the second special issue and then asked
her, point-blank, if she could follow that law as she had repeatedly told the prosecutor. Once
again, she told the trial judge that she understood the law and could follow it. Defense
counsel then declined to ask any additional questions. Ms. Day was perhaps simply confused
by defense counsel's question; at worst, she was a vacillating juror. When the record reflects
that a prospective juror vacillated or equivocated on her ability to follow the law, we must
defer to the trial judge's determination. (58) We overrule appellant's seventh point of error.

 In his eighth point of error, appellant claims that the trial judge erred in overruling his
challenge for cause against Matthew Smith because Mr. Smith stated that he would not
consider appellant's evidence of physical violence in his family as being mitigating. He was
not required to. A venireman is not challengeable for cause on the ground that he would not
consider a specific type of evidence to be mitigating. (59) Mr. Smith understood that each juror
decides what is mitigating, and he explained that he could consider a wide variety of
mitigating evidence, including evidence of intoxication. But he did not place a lot of weight
on some evidence, such as whether the person was abused as a child or his parents were not
there for him. Mr. Smith said, "Well, I'm sorry, that's terrible, but [the person] made the
choice to commit this crime." Mr. Smith said that he would consider all of the evidence. 
Merely because he did not consider violence in the home, poverty, or abandonment to be
mitigating did not make him subject to a challenge for cause. The trial judge did not abuse
his discretion in denying the challenge, and we overrule appellant's eighth point of error.

 In his ninth point of error, appellant claims that the trial judge erred in denying his
challenge for cause of David Calvery. But Mr. Calvery was removed from the jury before
deliberations began. We have explained that when an objectionable juror is seated on the
jury but does not participate in jury deliberations, a defendant has not been harmed. (60) We
overrule appellant's ninth point of error. We reject appellant's tenth point of error based on
the reasons set out in note 51. (61) Because (1) no objectionable juror deliberated in appellant's
case, (2) none of his claims concerning the challenges for cause had merit, and (3) no
erroneous ruling caused harm, we also reject appellant's contention, in his eleventh and
twelfth points of error, that he was deprived of a lawfully constituted jury because of the
wrongful denial of his challenges for cause. (62) We conclude that none of his jury selection
claims have merit.

 Trial Issues


 In his thirteenth point, appellant claims that the trial judge erred in denying his motion
for mistrial when one juror (David Calvery) read a newspaper article about the trial and told
other jurors that he had done so. We conclude that the trial judge did not abuse his discretion
in denying appellant's mistrial motion.

 The guilt stage of appellant's trial began on May 8th. The trial judge had repeatedly
instructed the jurors not to read or listen to any media coverage of this case. At the end of
the second day of trial, one juror, Shawn Stark, reported to the judge that a different juror had
mentioned reading a newspaper article about the case. First thing the next morning, the trial
judge questioned the jurors and discovered that David Calvery had told both Mr. Stark and 
another juror that he had read a Dallas Morning News article about the trial. Next, the trial
judge, prosecutor, and defense attorney questioned Mr. Calvery, who admitted that he had
read articles on both May 9th and 10th. Defense counsel asked that Mr. Calvery be
dismissed and replaced with the first alternate. Everyone agreed and that was done. 

 Then the trial judge questioned each of the other jurors individually. Each stated that
he had not read any articles or heard any news about the trial, although some had heard Mr.
Calvery say that he had read a newspaper article. Both the State and defense had an
opportunity to question the jurors, all of whom testified that nothing they had heard (or the
circumstances of being questioned) would affect their ability to be fair and impartial in the
case. All indicated that they would consider only the evidence from the witness stand in
considering the case. Nonetheless, at the end of all of the individual questioning, appellant
asked for a mistrial, claiming that his constitutional right to a fair and impartial jury had been
violated. (63) The trial judge denied the motion.

 We review the judge's ruling on a motion for mistrial under an abuse-of-discretion
standard. (64) A mistrial is required only in extreme circumstances for a narrow class of highly
prejudicial and incurable errors. (65) These are errors that are so obvious and egregious that a
reviewing court would necessarily reverse any conviction on appeal. (66) Claims asserting
prejudice from mid-trial publicity are considered by assessing two factors:


 First, the trial judge looks at the nature of the news material to determine if it
is inherently prejudicial and then evaluates such matters as the timing of the
coverage and its possible effects on legal defenses;

 Second, the trial judge must determine the likelihood that the publicity has, in
fact, reached the jurors. (67)



 Appellant claims that he was prejudiced because Mr. Calvery told the other jurors
about the content of the newspaper articles that he had read. (68) But all of the jurors testified
under oath that Mr. Calvery did not tell them about the content of those two articles. The
trial judge was entitled to believe them. Furthermore, the two articles at issue are in the
record and they reflect nothing more than what evidence had been introduced during the first
two days of trial. Because they merely repeated what the jury had already heard, appellant
has failed to prove that they were prejudicial. (69) We overrule his thirteenth point of error.

 In his fourteenth point of error, appellant claims that the trial judge erred in overruling
his objection to the response to a note the jury sent out during deliberations. This note asked
for a specific portion of Yahaira's testimony to be reread: "Whether or not Alfredo pushed
Mr. Harris into the tub or whether they fell into the tub." The trial judge identified the
responsive portions of Yahaira's testimony, but appellant wanted to include a portion of the
testimony in which defense counsel's question assumed that Alfredo pushed Mr. Harris into
the tub. The trial judge declined to include that portion of Yahaira's cross-examination
because counsel's question was focused on whether Alfredo was wearing a white T-shirt
when he was shot, not on whether Alfredo pushed appellant or they both fell. (70)

 When the jury sends out a note asking for certain testimony on a disputed point, the
trial judge must interpret that note, decide what testimony is most responsive to the inquiry,
and then limit the re-reading to that specific testimony. (71) The trial judge has great discretion
in deciding what testimony is responsive to the jury's dispute, and we will not disturb his
ruling unless (1) he has clearly abused that discretion, and (2) the defendant shows harm. (72)

 After reviewing appellant's request, the testimony at issue, and the trial judge's
explanation, we agree that the specific cross-examination that appellant pointed to was not
directly responsive to the jury's request. The trial judge did not abuse his discretion in
omitting it, but, even if he had abused his discretion in omitting it, appellant has failed to
show harm. (73) We overrule his point of error fourteen.

 In his point of error sixteen, appellant claims that the trial judge erred in denying his
requested jury instructions that compared the "reasonable doubt" standard to those of "clear
and convincing" and "preponderance of the evidence." (74) This same claim was raised and
rejected in Mays v. State, (75) which appellant does not cite or distinguish. Appellant has not
persuaded us that our reasoning in Mays was incorrect. We overrule this point of error.

 In his points of error seventeen and eighteen, appellant claims that the trial judge erred
in admitting certain crime scene and autopsy photographs over his Rule 403 objection. We
disagree. A trial judge's decision to admit photographs over a Rule 403 objection is
reviewed under an "abuse of discretion" standard. (76) Under Rule 403, all relevant evidence
is admissible unless "its probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence." (77) In conducting a Rule 403 analysis
concerning crime-scene or autopsy photographs, 

 the trial court must consider the host of factors affecting probativeness,
including the relative weight of the evidence and the degree to which its
proponent might be disadvantaged without it, and balance those factors against
the tendency, if any, that the photographs have to encourage resolution of
material issues on an inappropriate emotional basis. (78)

If the elements of a photograph are genuinely helpful to the jury in making its decision, the
photograph is inadmissible only if the emotional and prejudicial aspects substantially
outweigh those helpful aspects. (79)

 Appellant complains that the crime scene photographs were "extremely bloody" and
included close-ups of the bodies of both Alfredo and Carlos, as well as that of Roberto
Ramos, the victim in the extraneous capital murder. The autopsy photos were also "bloody"
and showed Alfredo's "nude upper torso" and close-ups of the bullet wounds.

 The crime-scene photographs were not excessive in number (80) and aided in the
development of the case at both the guilt stage and the punishment stage. They assisted the
police officers' testimony and their description of what they saw and did when they arrived
at the two different crime scenes. Although the photographs might show bloody bodies, they
are no more gruesome than the acts that appellant committed. (81) The trial judge did not abuse
his discretion in finding that the probative value of these crime-scene photographs was not
substantially outweighed by their prejudicial effect. (82)

 Concerning the autopsy photographs, we have held that such photographs are
generally admissible unless they depict mutilation of the victim caused by the autopsy itself. (83)
The main concern is that the jury might attribute certain injuries caused by the autopsy to the
defendant, unfairly prejudicing his case. (84) If the autopsy photographs simply depict the
injuries caused by the defendant's conduct, any gruesomeness cannot be called "unfairly"
prejudicial to the defendant. (85) The trial judge did not abuse his discretion in admitting the
autopsy photographs. We overrule appellant's points of error seventeen and eighteen.

Punishment Stage Claims


 In his nineteenth point of error, appellant claims that the trial judge erred by allowing
Alfredo Gallardo's family members to (1) remain in the courtroom during a portion of the
punishment stage, and (2) testify in the State's rebuttal case. He relies on Rule 614 of the
Texas Rules of Evidence, but does not discuss Article 36.03 of the Code of Criminal
Procedure, which trumps Rule 614 and permits a victim's close family members to remain
in the courtroom, even if they will be testifying, unless the defendant has made an offer of
proof to justify their exclusion. (86) Because appellant has not applied the appropriate statute
to the facts, (87) he has forfeited any claim of error under Rule 614, and we overrule this point.

 In his twentieth point of error, appellant claims that the trial judge erred in overruling
his objection to the State's gang expert testifying about what the tattoo "HUSTLA" means
because the witness was not qualified to give such an opinion. In his twenty-second point,
appellant claims that the trial judge erred in overruling his objection to Detective Nelson's
testimony that appellant was associated with the "Fishtrap Bloods" gang. We conclude that
the trial judge did not abuse his discretion in admitting Det. Nelson's testimony.

 After the guilt stage, the trial judge conducted a Nenno (88) hearing outside the jury's
presence to determine the admissibility of Detective Nelson's testimony. At the conclusion
of that hearing, he ruled that he was going to allow the testimony.

 I conclude that the field of expertise is a legitimate one, the subject matter falls
within that field, and the expert's testimony properly relies upon and/or utilizes
the principles involved in the field.


The trial judge relied on Horton v. State, (89) which he said was "on all fours." Horton upheld
the admission of testimony by a gang expert during the punishment stage that the defendant's
tattoos showed that he was a member of the "Five Deuce Hoover Crips" and that the purpose
of that gang was to engage in criminal activities that would make money for its members. (90) Appellant has not shown that the trial judge abused his discretion in finding Det.
Nelson qualified to testify to the meaning of "HUSTLA." (91) Det. Nelson said that he had
eighteen years experience and training related to gangs, including fifteen years on the Dallas
gang unit and three years in a federal unit. He was wise in the ways of the street. His factual
testimony concerning gang membership and gang tattoos showed his general familiarity with
this area of expertise and the prosecutor's questions were within that area of expertise. 
Appellant does not explain why he thinks Det. Nelson's experience was insufficient to allow
him to testify to the meaning of appellant's tattoos, specifically the "HUSTLA" tattoo. Nor
does he explain why the trial judge improperly followed the logic in Horton, (92) a case that the
judge found on "all fours." We agree that the trial judge did not abuse his discretion in
admitting Det. Nelson's tattoo testimony.

 In his twenty-second point, appellant claims that Det. Nelson's testimony about
appellant's connection to the "Fishtrap Bloods" was improper because (1) he failed to show
a "proper nexus or connection to the Defendant," and (2) this testimony violated appellant's
First Amendment rights of association. For this latter argument, appellant relies on two
federal cases dealing with admission of gang evidence to prove guilt, not to assess the proper
punishment. (93) Those cases are inapposite. 

 We have frequently upheld the admission of evidence of the defendant's gang
membership and the violent activities of that gang at the punishment stage of a capital murder
trial as relevant to the future dangerousness question. (94) To prove the relevance of a
defendant's membership in an organization or group, the state must show: (1) proof of the
group's violent and illegal activities, and (2) the defendant's membership. (95) 

 At the admissibility hearing, Det. Nelson's testimony showed that appellant was a
member of the "Fish Trap Blood" gang based on his numerous gang-related tattoos, a
drawing using symbols representative of that gang, his possession of red items (that gang's
"colors"), and his use of a red glove. Det. Nelson's testimony also described the activities
of that gang and its reputation in Dallas. We hold that the trial judge did not abuse his
discretion in admitting Detective Nelson's expert testimony on gang evidence and on
appellant's tattoos. We overrule points of error twenty and twenty-two.

 In point of error twenty-one, appellant claims that the trial judge erred in overruling
his objection to the admission of testimony about his prior criminal-trespass misdemeanor
conviction from Georgia because he had waived his right to counsel in that case. (96) 

 At trial, appellant objected to the testimony of Christopher Arno, the complainant in
the Georgia incident; on appeal he objects only to the admission of the certified copy of the
misdemeanor judgment, although at trial he expressly stated that he did not have any
objection to the admission of the certified judgment. Appellant all along objected only to
testimony about the Georgia incident, not the certified judgment. Thus, appellant has not
preserved any error because his objection at trial does not match his claim on appeal. 
Alternatively, the trial judge did not err in admitting the Georgia judgment because appellant
waived his right to counsel; he was not deprived of counsel in that case. A misdemeanor
conviction is not invalid or inadmissible simply because the defendant waived his right to
counsel before entering a plea. (97) At any rate, even if the trial judge erred in admitting
testimony of the Georgia incident and the judgment of conviction, we conclude that any error
was harmless. (98) We overrule appellant's twenty-first point of error.

 In his twenty-fourth point of error, appellant claims that the trial judge erred in
denying his motion to disqualify the Dallas District Attorney's Office because that office
hired appellant's former second-chair counsel as an assistant before trial. A district attorney,
not a trial judge, determines when a conflict of interest exists that requires his recusal or that
of his office. (99) Appellant suggests that we should create an exception to this general rule
because (1) this is a death case; (2) appellant's former counsel was hired after doing
extensive work for appellant; (3) appellate attorneys who would be under his former defense
counsel as head of the appellate section participated in the death-penalty case; (4) the
selection of death as one of the punishment options was made before the hiring of former
counsel, and (5) the appearance of impropriety in the due process of this case. (100) Appellant
makes no further argument concerning this claim; he does not, for example, take issue with
the evidence that shows that the Dallas District Attorneys' Office created a "Chinese wall"
between appellant's former counsel and the prosecutors who tried this case, nor does he
suggest that his former counsel ever conveyed any information about him to anyone in that
D.A.'s office. Under these circumstances, we are unpersuaded that his case should be
treated differently than other cases under the law. We overrule this point of error.

 In his twenty-fifth point of error, appellant asserts that the administrative judge erred
in granting the State's motion to recuse the elected judge of the district court because she had
granted appellant's motions concerning the constitutionality of the Texas death-penalty
statute. But appellant does not discuss Rule 18a of the Texas Rules of Civil Procedure which
governs the recusal of trial judges. That rule provides that "[a]n order granting a motion to
recuse is final and cannot be reviewed by appeal, mandamus, or otherwise." (101) We have
already held that a motion to recuse that is granted at the trial level is non-reviewable,
although the denial of such a motion to recuse is reviewable on appeal. (102) Thus, appellant
has no right of review under the recusal rules. Appellant also claims that the recusal of the
elected judge violated his due process rights, but he does not point to anywhere in the record
where he objected on this basis, and we cannot find any such objection. Therefore, this
constitutional claim is forfeited. (103) We overrule appellant's twenty-fifth point of error.

 In his twenty-sixth point of error, appellant claims that the trial judge erred in not
granting his request to videotape the voir dire proceedings. Appellant cites no statute or case
law that requires any such action. He admits that, in Massey v. State, (104) we held that the trial
judge does not abuse his discretion in refusing to allow videotaping of voir dire proceedings.
Appellant fails to persuade us that we should "find an exception" to that case for him or that
we should jettison Massey. We overrule this point of error.

 In his twenty-seventh point of error, appellant claims that the trial judge erred in not
permitting him to inform prospective jurors that the judge would assess a life sentence if the
jury is unable to reach a verdict on either of the special issues. He acknowledges that his
"request is directly opposite the statutory prohibition against telling the jury" about the
consequence of their failure to agree. (105) He also requests that we reconsider our holding in
Nobles v. State, (106) in which we rejected appellant's claim. We decline to reconsider our prior
holding, and we overrule appellant's twenty-seventh point of error.

 Starting with his point of error twenty-eight, appellant lists a series of claims that he
calls "Constitutional Issues Attacking the Texas Death Penalty Statute and Scheme" and
explains that he raises them (1) in the hope that we might reconsider our precedent overruling
each of these issues and (2) to preserve them for further review in federal court.

 In points twenty-nine through thirty-one, appellant argues that the Texas sentencing
scheme violates Apprendi v. New Jersey (107) and Ring v. Arizona (108) because its mitigation
charge does not assign the burden of proof to the State. He also argues that this defect
violates Article I, section 10 of the Texas Constitution. We have repeatedly rejected this
claim and do so again today. (109) 

 In point thirty-two, appellant argues that the "10-12" rule (110) confuses the jury, in
violation of the Eighth Amendment. We have previously rejected this argument. (111)

 In point thirty-three, appellant argues that the trial court did not define the terms
"probability," "continuing threat to society," and "criminal acts of violence" in its jury charge
on the two statutory special issues, violating the constitutional requirement that each
aggravating circumstance narrow the class of persons eligible for the death penalty. "There
is no error in omitting the definition of a word used in the statute when the word is used in
its ordinary sense and is easily comprehended by everyone." (112) Because these terms are
common and easily understood, we have repeatedly rejected this claim. (113) 

 In point thirty-four, appellant argues that Article 37.071 fails to mandate that the jury
consider specific evidence mitigating. We have previously rejected this argument. (114)

 In points twenty-eight and thirty-five through thirty-seven, appellant argues that the
special issues in Articles 37.071 and 37.0711 fail to provide guidance to juries, thus allowing
for unlimited juror discretion in imposing the death penalty. He also argues that the
arbitrariness of these factors prevent this Court from conducting meaningful appellate
review. This Court has rejected claims that the Texas death penalty sentencing procedure
allows for open-ended, unstructured discretion. (115) 

 In point thirty-eight, appellant claims that the trial judge erred in overruling his motion
to quash the indictment, which had alleged numerous constitutional defects in the Texas
death-penalty law. We reject this point of error as multifarious (116) and inadequately briefed. 

 In points thirty-nine and forty, appellant argues that the cumulative effect of the
constitutional violations in the Texas penalty procedure denied him due process of the law
under the United States and the Texas Constitution. Because we overrule each of appellant's 
points of error concerning the death-penalty statute, we likewise overrule his arguments
regarding their cumulative effect. 

 Having found that none of appellant's forty claims demonstrate reversible error, we
affirm the trial judge's judgment and sentence.

Delivered: May 21, 2014

Do Not Publish
1. Tex. Penal Code § 19.03(a)(2).
2. Tex. Code Crim. Proc. art. 37.071 § 2(g).
3. See Judge Alex Kozinski, The Wrong Stuff, 1992 BYU L. Rev. 325, 327.
4. Yahaira knew that Omar was in his room in the house, but she didn't want appellant to find
him. Unbeknownst to Yahaira, Omar had heard his father speaking in a "panicked" voice from the
living room, so he peeked out the door of his bedroom and saw appellant pointing a gun at his
father's head. Omar quietly closed and locked his bedroom door, climbed out the bedroom window,
and found the security guard for the mobile-home park. The security guard called 911 after Omar
told him about the ongoing robbery at his home.
5. The police responded immediately to the security guard's 911 call and were surrounding
the Gallardo's home when appellant shot Alfredo and Carlos. One officer heard five shots and
shortly thereafter, appellant came running outside. When the officers saw him, they yelled, "Police,"
and told appellant to get down on the ground. He didn't. Instead, he shot at them. As he ran toward
the back of the trailer, he bumped into one officer, who then shot appellant in the back and leg.
6. Appellant's Brief at 90.
7. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Adames v. State, 353 S.W.3d 854, 860
(Tex. Crim. App. 2011).
8. Adames, 353 S.W.3d at 860.
9. Id.
10. Jackson, 443 U.S. at 324.
11. Tex. Penal Code § 19.03(a)(2).
12. Id. § 6.03(a).
13. Ex parte Weinstein, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).
14. Rousseau v. State, 855 S.W.2d 666, 674 (Tex. Crim. App. 1993).
15. Id.
16. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). See also Godsey v. State,
719 S.W.2d 578, 580-81 (Tex. Crim. App. 1986). 

17. Appellant argues that the evidence would support a finding that Alfredo "pushed" appellant
into the Jacuzzi and that, while the two men "struggled," "the gun discharged." Appellant's Brief
at 92. Although one portion of Yahaira's testimony would support such an inference, other portions
of her testimony support the jury's finding that appellant immediately and intentionally shot Alfredo
after they fell into the tub, and that there was no struggle. We must view the evidence in the light
most favorable to the jury's verdict rather than appellant's theory. See Adames, 353 S.W.3d at 860.
18. Alvarado v. State, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995); Nelson v. State, 848
S.W.2d 126, 131-32 (Tex. Crim. App. 1992).
19. Jackson v. Virginia, 443 U.S. 307, 319 (1979); Adames v. State, 353 S.W.3d 854, 860
(Tex. Crim. App. 2011).
20. Tex. Code Crim. Proc. art. 37.071, §§ 2(b)(1), 2(c).
21. Russeau v. State, 291 S.W.3d 426, 433 (Tex. Crim. App. 2009) ("[T]he State had the
burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to
live, would commit criminal acts of violence, so as to constitute a continuing threat to people and
property."); Druery v. State, 225 S.W.3d 491, 506-07 (Tex. Crim. App. 2007) (same).
22. 632 S.W.2d 598 (Tex. Crim. App. 1982).
23. Id. at 603.
24. Russeau, 291 S.W.3d at 433-34 ("On this record, a rational jury could have concluded
beyond a reasonable doubt that appellant exhibited a dangerous aberration of character, that he was
a chronic and increasingly dangerous violator of our state's criminal laws, and that if he were
allowed to live, there is a probability that he would commit criminal acts of violence in the future,
so as to constitute a continuing threat to people and property."); Swain v. State, 181 S.W.3d 359,
370 (Tex. Crim. App. 2005) ("Both the facts of the instant offense and the other evidence showing
appellant's escalating pattern of violence support a finding of future dangerousness.").
25. See id.
26. Batson v. Kentucky, 476 U.S. 79 (1986).
27. Id. at 89.
28. See Purkett v. Elem, 514 U.S. 765, 767 (1995); Young v. State, 283 S.W.3d 854, 866 (Tex.
Crim. App. 2009).
29. Ford v. State, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999)
.
30. Id.
31. Grant v. State, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010) (citing Snyder v. Louisiana,
552 U.S. 472, 477 (2008)). 
32. The defense pointed out that the last alternate, Mary Wallace, also circled that statement
and the prosecutor did not strike her, but as the prosecutor explained, he did not have any more
strikes for the alternate jurors, so he could not strike her.
33. On appeal, appellant lists reasons why Ms. Moore would have made an ideal juror for the
State, but the issue is not whether the juror is death-qualified or even strongly in favor of the death
penalty, but rather whether the prosecutor struck her because of her race. Appellant argues that "the
race neutral reason given for striking prospective juror, Diane Moore, was implausible in that it was
based on a casual conversation with a distant cousin who was against the death penalty, not the
prospective juror." Appellant's Brief at 54. Indeed, the trial judge could have rejected the
prosecutor's explanation as implausible, irrational, or fantastic. But he did not. He believed that
facially neutral explanation while looking at the prosecutor and judging his demeanor and credibility. 
We cannot do so on this cold record. We must defer to the trial judge when it comes to assessing
credibility. Purkett v. Elem, 514 U.S. 765, 769 (1995); Harris v. State, 827 S.W.2d 949, 955 (Tex.
Crim. App. 1992) ("Because the trial judge is able to evaluate the credibility of the witnesses at the
Batson hearing before he makes his ruling, a reviewing court must view the record in the light most
favorable to that ruling and must not disturb that ruling unless it is clearly erroneous.").
34. Cf. Chambers v. State, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) (when the prosecutor did
not object to the trial judge's failure to rule on the defendant's prima facie case, that issue became
moot and could not be raised on appeal).
35. Appellant struck 50% of the Asians on the panel, but there is little significance to that
statistic because there were only two Asians on the panel to begin with.
36. See Woodward v. Epps, 580 F.3d 318, 339 (5th Cir. 2009) (although State struck 100% of
the black jurors, that fact alone does not support a finding of discrimination); Medellin v. Dretke, 371
F.3d 270, 278 (5th Cir. 2004) ("For the statistical evidence to be relevant, data concerning the entire
jury pool is necessary. The number of strikes used to excuse minority and male jury members is
irrelevant on its own."). Cf. United States v. Alvarado, 923 F.2d 253, 255 (2d Cir. 1991) ("[T]he
prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the
jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether
this rate creates a statistical disparity would require knowing the minority percentage of the venire;
for example, if the minority percentage of the venire was 50, it could be expected that a prosecutor,
acting without discriminatory intent, would use 50 percent of his challenges against minorities."). 
37. Cf. Watkins v. State, 245 S.W.3d 444, 451-52 (Tex. Crim. App. 2008) ("[O]f the first
thirty-seven prospective jurors
--those who were 'in range' to be chosen as jurors or as the alternate
juror--22% (or eight divided by thirty-seven) were African-American. A random selection would
be expected to yield 2 or 3 (or 22% of 12 total jurors, plus one alternate) African-Americans on the
[defendant's] jury. Instead, only one (8% of 12 total jurors, plus one alternate) was originally
selected. Moreover, the State used 55% of its peremptory challenges (six of eleven) to exclude 88%
(seven of eight) of the African-Americans from the prospective jury pool. Clearly, the State used a
disproportionate number of its peremptory challenges (55% of its challenges against an identifiable
racial group that made up only 22% of the venire that was 'in range') to exclude almost all of the
African-American veniremen from jury service in [defendant's] case.").
38. Actually, four different judges (Judges Biard, Parker, Fry, and Snipes) were involved in
the Batson hearing because four different judges participated in the jury selection and trial.
39. Purkett v. Elem, 514 U.S. 765, 769 (1995) ("The prosecutor's proffered explanation in this
case-that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard-is
race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason
for the strike."); Watkins, 245 S.W.3d at 447 ("At the second step of this process, the proponent of
the strike need only tender an explanation that is race neutral on its face. The ultimate plausibility
of that race-neutral explanation is to be considered as part of the third step of the analysis, in which
the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his
burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the
product of the proponent's purposeful discrimination.").
40. See Mathis v. State, 67 S.W.3d 918, 924-25 (Tex. Crim. App. 2002) (prosecutor's
explanation that he struck a juror because she felt that the death penalty was imposed too frequently
was a race-neutral explanation).
41. See Watkins, 245 S.W.3d at 450-51. 
42. The prosecutor seemed to imply that the juror might also cause friction on the jury.
43. See Elem, 514 U.S. at 768-69 (a second-stage race-neutral explanation need not be "a
reason that makes sense," but simply a reason that does not deny equal protection; a race-neutral
explanation that is "silly or superstitious" satisfies the second stage of Batson, though a trial judge
"may choose to disbelieve a silly or superstitious reason" at the third stage).
44. Id. at 768 ("
It is not until the third step that the persuasiveness of the justification becomes
relevant--the step in which the trial court determines whether the opponent of the strike has carried
his burden of proving purposeful discrimination.")
45. Hernandez v. New York, 500 U.S. 352, 365 (1991).
46. Id.
47. Id. (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)).
48. Batson, 476 U.S. at 98 n.21.
49. See Herron v. State, 86 S.W.3d 621, 630-31 (Tex. Crim. App. 2002) ("Because the trial
court's decision often turns largely on an evaluation of credibility, we give the court's decision great
deference and will not disturb it unless it is clearly erroneous"; deferring to trial judge's finding that
prosecutor's explanation that he struck potential juror the D.A.'s investigator said "ha[d] a chip on
her shoulder" and had a reputation at work for being close-minded; because the explanation was a
race-neutral one that the defendant failed to rebut, the trial judge did not clearly err in denying
Batson challenge); see also Grant v. State, 325 S.W.3d 655, 658-60 (Tex. Crim. App. 2010) (record
supported trial judge's finding of no pretext when prospective juror listed his spouse's employer as
the Wal-Mart return center where prosecutors believed that the defendant's girlfriend had been
employed).
50. Herron, 86 S.W.3d at 630.
51. Because the trial judge granted appellant an extra peremptory challenge for the alternate
jurors and appellant used that additional peremptory challenge to remove Ms. Thomas as an
alternate, his claim is moot, and he has not shown harm.
52. See Saldano v. State, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). As we explained, 

 Harm from the erroneous denial of a defense challenge for cause occurs: (1) when a
defendant uses a peremptory challenge to remove a veniremember whom the trial
court should have excused for cause at the defendant's request, (2) the defendant uses
all of his statutorily allotted peremptory challenges, and (3) the defendant
unsuccessfully requests an additional peremptory challenge which he claims he
would use to remove another veniremember whom the defendant identifies as
"objectionable" and who actually sits on the jury. When these conditions are met, this
Court has stated that the trial court's erroneous denial of a defense challenge for
cause harms the defendant by wrongfully depriving him of at least one of his
statutory peremptory challenges that he could have used to remove the juror whom
the defendant identifies as "objectionable." 

Id. (citations omitted).
53. Id.
54. Id.
55. Threadgill v. State, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004); Feldman v. State, 71
S.W.3d 738, 744 (Tex. Crim. App. 2002).
56. Feldman, 71 S.W.3d at 744.
57. Id.
58. Gardner v. State, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009).
59. Joubert v. State, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).
60. See, e.g., Cooks v. State, 844 S.W.2d 697, 722 (Tex. Crim. App. 1992) (when objectionable
alternate juror was not among those who actually deliberated, defendant was not harmed by trial
judge's failure to grant challenge for cause).
61. See note 51, supra.
62. In these two points of error, appellant claims that "the jury as constituted was biased or
prejudiced which deprived appellant of a fair trial." He argues that, because the trial judge overruled
his challenges for cause, the jury was, ipso facto, prejudiced against him. Because we conclude that
the trial judge did not err in overruling these challenges, we necessarily conclude that the trial
judge's action did not thereby deny appellant of a lawfully constituted jury.
63. Appellant's objection was as follows: "We would ask for a mistrial in the case based on
th Fifth Amendment, due process; Sixth Amendment right to a fair and impartial jury; Fourteenth
Amendment, due course of law, under the Texas Constitution."
64. Hawkins v. State, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).
65. Id.
66. Id.
67. Ladner v. State, 868 S.W.2d 417, 423 (Tex. App.-Tyler 1993, pet. ref'd) (noting that
"[o]ur Court of Criminal Appeals has not formulated a doctrine to deal with mid-trial publicity" and
adopting the federal two-pronged approach) (citing United States v. Manzella, 782 F.2d 533, 541-
44
(5th Cir. 1986)). See generally, Andrea G. Nadel, Juror's Reading of Newspaper Account of Trial
in State Criminal Case During Its Progress as Ground For Mistrial, New Trial, or Reversal, 46
A.L.R. 4th 11 (1986 & Supp. 2014). 
68. Appellant also claims that the trial judge's questioning of the jurors and removal of Mr.
Calvery had a "chilling" effect on the jury such that he was denied a fair trial and an impartial jury. 
Appellant's Brief at 87. Appellant did not object on this basis at trial-indeed he had requested that
Mr. Calvery be removed from the jury-so he has not preserved this claim for appeal. 
69. See Andrea G. Nadel, supra note 67, § 2 (although ultimate decision of whether to grant
mistrial when jurors have read newspaper accounts rests in sound discretion of trial judge, certain 
general rules apply such as "the principle that a juror's reading of a newspaper account of the trial
in which he is sitting is not a ground for a new trial, mistrial, or reversal if the article contains
nothing prejudicial to the defendant's case. This rule has been applied to cases where the article
merely set forth an accurate and unbiased account of the occurrences which took place in the
courtroom and in the presence of, or within the hearing of, the jury, it being reasoned that what the
jurors already know first hand cannot affect their decisions when later brought to their attention by
something they read.") (section references omitted).
70. The trial judge read the portion of the testimony that appellant wanted to include and added
his comments:


Q: At the time your father got out of the closet with Mr. Harris and went into the bathroom,
what was he wearing?

A: It was a white T-shirt. 

Q: A white T-shirt?

A: Yes.

Q: That was a regular white T-shirt, short sleeve?

A: Yes.

Q: That we're all familiar with, I guess?

A: Yes.


[Judge speaking] And so the witness is thinking-in my judgment, she is talking about a white
T-shirt. And [defense counsel] throws in:


Q: And at the time he pushed Mr. Harris in the bathtub and fell on top of him, was he wearing
the same white T-shirt?

A: Yes.


[Judge speaking] So, again I don't think that is responsive to [the jury's question] at all. And
I note your objection and it is overruled. 
71. See Brown v. State, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994); Iness v. State, 606 S.W.2d
306, 314 (Tex. Crim. App. 1980).
72. Brown, 870 S.W.2d at 55.
73. The testimony that was read to the jury included Yahaira's direct and cross-examination
statements that her father pushed appellant into the tub and that they had both fallen into it. The
content that appellant wanted before the jury-that Alfredo pushed appellant into the tub-was
contained in the testimony that was read to the jury, so appellant can show no harm in the trial
judge's refusal to read different testimony that addresses the same point.
74. Concerning the burden of proof, the trial judge instructed the jury as follows:

 The prosecution has the burden of proving the Defendant guilty and it must
do so by proving each and every element of the offense charged beyond a reasonable
doubt. And if it fails to do so, you must acquit the Defendant.

 It is not required that the prosecution prove guilt beyond all possible doubt;
it is required that the prosecution's proof excludes all reasonable doubt concerning
the Defendant's guilt.
75. 318 S.W.3d 368, 389 (Tex. Crim. App. 2010).
76. Salazar v. State, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001).
77. Tex. R. Evid. 403.
78. Ladd v. State, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). The factors that a trial judge
should consider include the number of exhibits offered, their gruesomeness, their detail, their size,
whether they are color or black and white, whether they are close-up, whether the body depicted is
clothed or naked, the availability of other means of proof, and other circumstances unique to the
individual case. See Prible v. State, 175 S.W.3d 724, 734 (Tex. Crim. App. 2005). "
It is also
relevant for the trial court to consider whether the body as photographed has been altered since the
crime in some way (e.g., by autopsy) that might enhance its gruesomeness to the defendant's
detriment." Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). 
79. Erazo v. State, 144 S.W.3d 487, 491-92 (Tex. Crim. App. 2004).
80. In point of error seventeen, appellant complains of the admission of eight crime-scene
photographs, while in point of error eighteen he complains of fourteen autopsy photographs.
81. See Gallo v. State, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007) (photographs of deceased
child victim showed only those injuries that she suffered while in defendant's care and "were no
more gruesome than would be expected in this sort of crime").
82. See Shuffield v. State, 189 S.W.3d 782, 787-88 (Tex. Crim. App. 2006) (trial judge did not
abuse his discretion is admitting crime-scene photographs because they were probative of the crime
scene and the injuries received by the victim, they were necessary in developing the State's case, and
they were not overly gruesome).
83. Rojas v. State, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); Santellan v. State, 939
S.W.2d 155, 172 (Tex. Crim. App. 1997).
84. See Rojas, 986 S.W.2d at 249 (autopsy photographs were admissible because the gunshot
wounds and trauma to the pelvic area that are depicted in the photographs were a result of appellant's
actions, not the performance of the autopsy); (a change caused as part
of the autopsy process which is of minor significance does not prevent the admission of the
photograph when its disturbing nature is due primarily to the injuries caused by appellant).
85. Santellan, 939 S.W.2d at 172 (autopsy photographs "only depict the damage perpetrated
by appellant.").
86. Article 36.03(a) and (b) read as follows:

(a) Notwithstanding Rule 614, Texas Rules of Evidence, a court at the request of a
party may order the exclusion of a witness who for the purposes of the prosecution
is a victim, close relative of a deceased victim, or guardian of a victim only if the
witness is to testify and the court determines that the testimony of the witness
would be materially affected if the witness hears other testimony at the trial.

(b) On the objection of the opposing party, the court may require the party requesting
exclusion of a witness under Subsection (a) to make an offer of proof to justify the
exclusion.
87. Under Article 36.03, appellant was required to show, with an offer of proof in the trial
court, that the testimony of Maria and Yahaira Gallardo would be materially affected by the
testimony of other witnesses. Their testimony on rebuttal simply established the impact the offense
had upon their family. There is no suggestion and no proof that this testimony was, or would likely
be, impacted by hearing other witnesses during the punishment phase.
88. Nenno v. State, 970 S.W.2d 549 (Tex. Crim. App. 1998).
89. No. 14-10-00253-CR, 2011 WL 742654 (Tex. App.-Houston [14th Dist.] March 3, 2011,
pet. dism'd) (not designated for publication).
90. Id. at *3. Although neither trial nor appellate judges should rely on unpublished decisions
as legal authority, they may find the reasoning in such cases instructive. See Carrillo v. State, 98
S.W.3d 789, 794 (Tex. App.-Amarillo 2003, pet. ref'd).
91. Detective Nelson testified that appellant's tattoo meant "hustling" and that "[h]ustling
means about getting his money" by selling narcotics. "Most gang members, they're not selling
cookies. They're either selling narcotics or they're jacking and robbing people."
92. Horton, 2011 WL 742654 at *3; see also Burleson v. State, No. 02-09-178-CR, 2010 WL
1730822, *5 (Tex. App.-Fort Worth April 29, 2010, no pet.) (not designated for publication) (police
officer with 17 years experience in gang unit was qualified to testify about defendant's gang
membership, the activities of that gang, and defendant's tattoos and how they signified membership
in the gang); Hernandez v. State, No. 03-04-356-CR, 2006 WL 191918, *3-5 (Tex. App-Austin Jan.
26, 2006, pet. ref'd) (not designated for publication) (upholding trial judge's decision that police
sergeant and deputy sheriff were qualified as gang experts).
93. See United States v. Polasek, 162 F.3d 878, 884-87 (5th Cir. 1998) (reversing defendant's
conviction for fraud by changing odometers when government offered evidence that several of
defendant's former business associates had been convicted of odometer fraud; there was no evidence
that defendant knew of their actions or had anything to do with them; reversible error when
government sought to prove "guilt by association"); United States v. Irvin, 87 F.3d 860, 865-66 (7th
Cir. 1996) (trial judge abused his discretion in permitting "highly charged gang affiliation" evidence,
involving satanic imagery, to prove guilt when defendant was mere passenger in car containing drugs
and no evidence showed that gang was involved in drug distribution).
94. See, e.g., Davis v. State, 329 S.W.3d 798, 805-06 (Tex. Crim. App. 2010) (upholding the
admission of evidence of defendant's membership in the Satanic religion at punishment phase of
capital murder trial as that evidence was relevant to the "future dangerousness" special issue); Batiste
v. State, No. AP-76600, 2013 WL 2424134, *5 (Tex. Crim. App. June 5, 2013) (not designated for
publication) (upholding testimony of gang membership and defendant's gang-related tattoos as
relevant to future dangerousness question); Vasquez v. State, 67 S.W.3d 229, 239-
40 (Tex. Crim.
App. 2002) (evidence of defendant's membership in the Mexican Mafia admissible to show motive
for gang-related murder and evidence of his tattoo showed gang membership); Mason v. State, 905
S.W.2d 570, 577 (Tex. Crim. App. 1995) (upholding admission of gang evidence at punishment
stage of capital murder trial).
95. Mason, 905 S.W.2d at 577.
96. Appellant's full objection was as follows:

 We just wanted to reurge our objection to the witness that we anticipate the State is
calling next regarding the Clayton County, Georgia offenses, as the record the State
has tendered to us show our client waived his right to counsel and was not
represented by a lawyer in that offense, and we would object to inclusion of any
testimony regarding that offense or those incidents under the Sixth and Eighth
Amendments of the United States Constitution.
97. See Disheroon v. State, 687 S.W.2d 332, 334 (Tex. Crim. App. 1985) (to bar the admission
of a prior conviction because the defendant was without assistance of counsel, the burden is on the
defendant to prove that he was indigent, without counsel, and did not voluntarily waive the right to
counsel); Taylor v. State, 470 S.W.2d 663, 663-64 (Tex. Crim. App. 1971) (no error in penalty-stage
admission of certified copies of judgment that were silent as to whether defendant had been
represented by counsel where no objection was made to admission of documents and "no claim
[was] advanced . . . that at the time of such conviction the appellant was indigent, without counsel
and did not waive the right of counsel, or that he was deprived of counsel in any manner"). 
98. Tex. R. App. P. 44.2(b); see Orsag v. State, 312 S.W.3d 105, 122 (Tex. App.-Houston
[14th Dist.] 2010, pet. ref'd) (assuming admission of certified reset forms from prior DWI
convictions was error, it was harmless under Rule 44.2(b)); Johnson v. State, No. 01-02-00861-CR,
2003 WL 21666109, *3 (Tex. App.-Houston [1st Dist.] 2003, no pet.) (not designated for
publication) (error in admitting judgment and sentence of prior misdemeanor theft conviction into
evidence after defendant admitted the prior conviction was harmless).
99. See Coleman v. State, 246 S.W.3d 76, 81 (Tex. Crim. App. 2008); State ex rel. Eidson v.
Edwards, 793 S.W.2d 1, 5 (Tex. Crim. App. 1990).
100. Appellant's Brief at 114.
101. Tex. R. Civ. P. 18a(j)(1)(B).
102. Tex. R. Civ. P. 18a(j)(1)(A); Gaal v. State, 332 S.W.3d 448, 456-57 (Tex. Crim. App.
2011).
103. Fuller v. State, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("[A]lmost all error--even
constitutional error--may be forfeited if the appellant failed to object"); Anderson v. State, 301
S.W.3d 276, 280 (Tex. Crim. App. 2009) ("Indeed, our prior decisions make clear that numerous
constitutional rights, including those that implicate a defendant's due process rights, may be forfeited
for purposes of appellate review unless properly preserved."); Briggs v. State, 789 S.W.2d 918, 924
(Tex. Crim. App. 1990) (holding errors based on the constitutional rights to confrontation and due
process may be waived by failure to object at trial). 
104. 933 S.W.2d 141, 151 (Tex. Crim. App. 1996).
105. Appellant's Brief at 117.
106. 843 S.W.2d 503, 508-09 (Tex. Crim. App. 1992).
107. 530 U.S. 466 (2000).
108. 536 U.S. 584 (2002).
109. Saldano v. State, 232 S.W.3d 77, 107-09 (Tex. Crim. App. 2007); Russeau v. State, 171
S.W.3d 871, 886 (Tex. Crim. App. 2005); Resendiz v. State, 112 S.W.3d 541, 549-50 (Tex. Crim.
App. 2003).
110. Tex. Code Crim. Proc. art. 37.071 §§ 2(d)(2) & 2(f)(2). 
111. Leza v. State, 351 S.W.3d 344, 361-62 (Tex. Crim. App. 2011); Russeau, 171 S.W.3d at
886.
112. Resendiz, 112 S.W.3d at 550 (citing Russell v. State, 665 S.W.2d 771, 780 (Tex. Crim.
App. 1983)).
113. Leza, 351 S.W.3d at 362; Russeau v. State, 291 S.W.3d 426, 434-35 (Tex. Crim. App.
2009). 
114. Busby v. State, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008). 
115. See, e.g., Saldano v. State, 232 S.W.3d at 104-09; Turner v. State, 87 S.W.3d 111, 118
(Tex. Crim. App. 2002); Sells v. State; 121 S.W.3d 748, 767-68 (Tex. Crim. App. 2003). 
116. Appellant alleges eleven separate constitutional violations in a single point of error.